UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        v.                              )
                                        )        Criminal No. 05-0151 (PLF)
TIMOTHY D. NAEGELE,                     )
                                        )
            Defendant.                  )
_____)


OPINION

        Rule 702 of the Federal Rules of Evidence effectively codifies the Supreme

Court's decisions in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and

Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999).  In Daubert, the Court charged trial judges

with the responsibility of acting as "gatekeepers" to shield unreliable or irrelevant expert

testimony and evidence from the jury.  In Kumho the Court made clear that the gatekeeper

function applies to all expert testimony, not just scientifically-based testimony.  Rule 702

therefore provides that if the Court finds that scientific, technical or other specialized knowledge

"will assist the trier of fact to understand the evidence or to determine a fact in issue," and if the

Court finds that the witness is qualified as an expert "by knowledge, skill, experience, training, or

education," then the Court may permit the witness to testify – so long as the witness' testimony is

based on "sufficient facts or data," the testimony "is the product of reliable principles and

methods," and the witness has "applied the principles and methodology reliably to the facts of the

case."  FED. R. EVID. 702.

As the D.C. Circuit has explained, the twin requirements for the admissibility of expert testimony are evidentiary reliability and relevance.  See Ambrosini v. LaBarraque, 101 F.3d 129, 133 (D.C. Cir. 1996); see also United States v. Libby, ___ F. Supp. 2d ___, 2006 WL 3095680 *2-3 (D.D.C. Nov. 2, 2006); McReynolds v. Sodexho, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004); Groobert v. Georgetown College, 219 F. Supp. 2d 1, 6 (D.D.C. 2002).  With respect to evidentiary reliability, the Court's focus must be on the methodology or reasoning employed by application of the factors in Rule 702 and the non-exhaustive lists of factors set forth in Daubert and Kumho.  See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 595 (the "focus, of course, must be solely on principles and methodology, not on the conclusions they generate"); Ambrosini v. LaBarraque, 101 F.3d 129, 140 (D.C. Cir. 1996) ("the admissibility inquiry focuses not on conclusions but on approaches").  With respect to relevance, the Court must determine whether the proffered testimony is sufficiently tied to the facts of the case and whether it will aid the jury in resolving a factual dispute.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. at 592-93.

In this case, the defendant has proffered four experts, and the government has proffered one.  On November 8, 2006, pursuant to this Court's Scheduling Order, the defendant provided expert disclosures under Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure for three proposed experts:  Michael G. Wolff, Bruce G. Dubinsky and Mark W. Foster, as well as the "Laboratory Report" of his fourth proposed expert, Douglas S. Lacey.  On December 15, 2006, the defendant provided expert witness summaries (each five pages or less), along with the curriculum vitae for each of the same four proposed experts.  Similarly, the government filed its expert report under Rule 16(a)(1)(G) of the Federal Rules of Criminal Procedure for its one

proffered expert, Tamara Miles Ogier, on November 8, 2006.  It provided a brief witness

summary for Ms. Ogier on December 15, 2006 and, pursuant to this Court's minute order of

December 19, 2006, a more extensive witness summary on December 22, 2006.  Pursuant to the

Court's Memorandum Opinion and Order of January 5, 2007, and its minute order of January 9,

2007, the defendant provided all of the underlying documents on which three of its four proffered

experts relied on January 8, 2007, and did the same with respect to its fourth proffered expert,

Mr. Foster, on January 16, 2007.[1]  The Court conducted <u>Daubert</u> hearings on January 8, 2007,

January 10, 2007, and January 18, 2007.  The Court has considered the submissions of the

parties, the testimony of the witnesses at the <u>Daubert</u> hearings, and the arguments of counsel with

respect to why the proponent believes the testimony of each proffered expert should be admitted

and why the opponent believes it should not.  The Court's rulings follow.

### A.  Douglas S. Lacey

Douglas S. Lacey is a forensic audio/video examiner with BEK TEK LLC, a

company that provides consultations, examinations, research and instruction in criminal, civil

investigative and administrative matters involving laboratory analyses of audio and video

---

[1]      According to counsel for the defendant, on January 3, 2007, pursuant to an
agreement between the parties, the defendant already had provided much of this material to
government counsel.

With respect to the Court's Memorandum Opinion and Order of January 5, 2007
regarding expert witnesses, the Court notes that any concerns it expressed in that Memorandum
Opinion and Order about the differences between the November 8, 2006 and December 15, 2006
expert witness summaries submitted by the defense have been alleviated and/or mooted by the
<u>Daubert</u> hearings.

recordings.  Mr. Lacey has a Bachelor of Science degree in Electrical Engineering from the

Audio Engineering Program at the University of Miami.  From September 1996 through June

2003, he worked as an electronics engineer at the Forensic Laboratory of the Federal Bureau of

Investigation in Quantico, Virginia, where he served as a forensic audio examiner.  Since

October 1999, he has been with BEK TEK.  In both his government and private sector positions,

Mr. Lacey has conducted forensic examinations of audio and video recordings, including the

authentication of recordings, intelligibility enhancement, and identification and classification of

voice and non-voice signals.  Over the course of his career, Mr. Lacey has conducted

examinations on over 2,200 separate audio and video recordings, has testified as an expert

witness, and has authored six articles in the fields of forensic audio and video analyses.

      In this case, Mr. Lacey was retained by the defense to analyze the audio recording

of the Creditors Meeting held on May 23, 2000 with respect to Mr. Naegele's Chapter 7

bankruptcy.  Count 10 of the indictment charges that the defendant made a material false

statement under oath at the Creditors Meeting, in violation of 18 U.S.C. § 152(2) – specifically,

that he "falsely testify[ied] under oath that he had only rental vehicles when, in truth and in fact

as he then well knew, he possessed a model year 2000 Chevrolet Malibu which he had acquired

on or about April 17, 2000."  The transcript of the Creditors Meeting prepared by the government

includes the following exchange:

      MR. MERVIS:  Do you have a car sir?

      DEFENDANT:  No.  Ah, I've, I've been renting a car from
      National Car (UI).

      MR. MERVIS:  In Florida and LA and here or?

> DEFENDANT:  In LA primarily.  Ah, here, here, ah, ah, when I'm
> in Washington I often use the Metro.
>
> MR. MERVIS:  Do you know what your, your automobile rental
> payments are?
>
> DEFENDANT: They've been running about a thousand a month.

Government's Draft Transcript, Wolff Exhibit 2, Tab 6 at 7.  The question that Mr. Lacey was

asked to address in his expert report was whether Mr. Naegele actually said "No" before he said

"I've been renting a car from National Car (UI)."

According to Mr. Lacey's report and testimony, he analyzed that specific segment

of the tape recording of the Creditors Meeting to determine whether intelligible voice

information was present and could be reliably transcribed.  In the course of this work, he

enhanced the audio recording and repeatedly listened, with the aid of head phones, to both the

enhanced and unenhanced versions.  In addition to listening numerous times to both versions of

the recording – a methodology described by Mr. Lacey as "critical listening" – Mr. Lacey also

used the methodologies of time waveform analysis and spectrographic analysis.  He described the

former as a methodology that shows time, amplitude and volume and the latter as a methodology

that shows time and (sound) frequency.  In the course of his spectrographic analysis, he

compared the designated portion with certain other portions of the audio recording where the

word "no" also allegedly was used.  In some cases, he found similar characteristics to the low

level speech segment of the designated portion and therefore concluded that these portions also

were unintelligible and could not be transcribed.  In other portions of the recording where the

word "no" was purportedly used, he found the word to be intelligible.  Compare Lacey Exhibit 4

(Lacey work papers) at 4, ¶ 13, with Lacey Exhibit 4 at 4-5, ¶ 14.

Based on the three methodologies he employed, Mr. Lacey concluded that "the designated portion contains no indications of intelligible vocalizations, voice pitch, or voice formant information.  Therefore, if any speech information exists in this portion, it cannot be transcribed."  Expert Witness Summary for Douglas Lacey, Lacey Exhibit 3 at 3.  Mr. Lacey testified that he has testified as an expert witness on three occasions with respect to the analysis of audio recordings and that all three centered on audio enhancements.  In response to a question from the Court, he stated that he has never testified concerning the intelligibility or unintelligibility of particular segments of audio recordings or their enhancements.

Mr. Lacey clearly is an expert in forensic audio examination and analysis.  He is qualified to perform all three of the tests he has performed in this case – audio enhancements of recordings, time waveform analysis, and spectrographic analysis.  There is nothing to suggest that any of these tests or the methodology used by Mr. Lacey in performing them is not reliable.  He certainly is qualified to explain any or all of these processes to the jury to the extent the Court finds his testimony regarding them relevant and helpful to the jury in performing its responsibilities to find facts and resolve factual disputes.  Indeed, the government has no objection to Mr. Lacey explaining the first methodology – audio enhancement – to the jury.  Since both sides apparently intend to offer enhancements of the audio recording of the May 23 Creditors Meeting in evidence at trial, the Court concludes that an explanation of the enhancement process by a recognized expert will be of assistance to the jury.

With respect to the time waveform analysis and spectrographic analysis, however, the Court concludes that testimony by Mr. Lacey with respect to these methodologies would be relevant and admissible only if the Court permits the jury also to hear and consider Mr. Lacey's

6

opinion that the designated portion of the recording of the Creditors Meeting "contains no indications of intelligible vocalizations, voice pitch, or voice formant information" and that the speech information (if any) contained therein therefore cannot reliably be transcribed.  See Lacey Exhibit 3 at 3.  The Court will not permit Mr. Lacey to testify to this opinion at trial.

It is the jury's function to determine whether the word "no" was stated by Mr. Naegele at the Creditors Meeting in response to the question "Do you have a car?".  To permit Mr. Lacey to testify that he could not hear the word "no" at that point in the recording of the meeting would be an invasion of the jury's prerogative to find the facts in this case.  The jury is just as capable of listening to the enhanced and unenhanced versions of the audio recordings of the Creditors Meeting, and the jury needs no assistance in deciding what it hears.  See United States v. Mitchell, 49 F.3d 769, 780 (D.C. Cir. 1995) (The "district court was well within its discretion in concluding that expert testimony was unnecessary to elucidate tape recorded conversations.  Such material . . . is squarely within the traditional province of the jury."); see also United States v. Libby, 2006 WL 3095680 at *11.[2]  The Court therefore will not permit Mr. Lacey to testify about waveform analysis, spectrographic analysis or the conclusions he reached from engaging in these methodologies.  Nor will it permit him to offer an opinion that the word

_____

[2]        The Court has read the two cases provided to it by the defendant regarding spectrography.  The Supreme Court of Alaska upheld a trial court's decision that spectrography was generally accepted within the relevant scientific community.  See State v. Coon, 974 P.2d 386, 402 (Alaska 1999).  That says nothing, however, about the relevance or potential assistance to the jury of Mr. Lacey's specific opinion in this matter – whether or not the defendant said "No" in response to a specific question.  The court in United States v. Maivia – a decision rendered pre-Daubert when Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), was the law in the federal courts – permitted a spectrography expert to testify for voice identification purposes.  See United States v. Maivia, 728 F. Supp. 1471, 1478 (D. Haw. 1990).  Again, that is a different inquiry from the issue before the jury in this case, as to which Mr. Lacey's testimony would not be helpful.

"no" was unintelligible or was not capable of being transcribed at the relevant point in the recording of the Creditors Meeting.[3]

### B. Tamara Miles Ogier and Michael G. Wolff

Tamara Miles Ogier and Michael Wolff are both attorneys who specialize in bankruptcy law. Mr. Wolff has practiced law for 22 years, representing debtors in bankruptcy cases; he has served as a Panel Trustee over the last sixteen years. He testified that he has served as a Panel Trustee in more than 10,000 Chapter 7 cases and in several thousand Chapter 11 cases. He also lectures on bankruptcy law in Maryland continuing legal education programs. Ms. Ogier has been an attorney for twelve years, practicing bankruptcy law, and has served as a Panel Trustee since 1998. She testified that she has administered approximately 7,000 Chapter 7 bankruptcies. Both were proffered as experts in bankruptcy law and bankruptcy proceedings in general and to explain the Chapter 7 bankruptcy filing process, including the key players in that process. The Court agrees that both are experts and are qualified to testify about each of these matters. Should the parties choose to call them as witnesses, such testimony would be helpful to the jury.

The Court will permit Mr. Wolff to testify about the bankruptcy process generally, including the process of the amendment of Schedules, and the role of the Panel Trustee. As the Court indicated after hearing further testimony from Mr. Wolff during the continued Daubert hearing on January 18, 2007, however, the Court will not allow Mr. Wolff to testify regarding the

---

[3]     In view of this ruling, and as suggested at a recent status conference, the defense may decide not to call Mr. Lacey at all and instead reach a stipulation with the government with respect to tapes of the Creditors Meeting, enhancements thereof, and transcripts.

specifics of Mr. Naegele's Schedules and the Creditors Meeting in Mr. Naegele's case, second-guessing the specific decisions and actions of Wendall Webster, the Panel Trustee, or of the creditors' counsel along the way.  For example, Mr. Wolff may not testify that based on his reading of the transcript of the Creditors' Meeting and his own experience as a Panel Trustee, Mr. Webster should have instructed Mr. Naegele to amend any particular Schedule as a result of any specific answer to a question asked at the meeting.

Ms. Ogier and Mr. Wolff also were both offered as experts on contingent claims in Chapter 7 proceedings, a matter relevant to Counts 5 and 8 of the Indictment.[4]  Count 5 of the indictment charges Mr. Naegele with making a material false statement in his Bankruptcy Schedules in violation of 18 U.S.C. § 152(3) – specifically "that he had no contingent claims of any nature when, in truth and in fact as he then well knew, he had contingency fee agreements with clients of his law practice," an item which the Indictment alleges should have been put on Bankruptcy Schedule B, Item 20.  Count 8 of the indictment charges Mr. Naegele with falsely testifying under oath at the Creditors Meeting that "he had listed all of his assets in his bankruptcy documents when in truth and in fact as he then well knew, he had at least one asset that he had not listed, specifically, at least one contingent claim," in violation of 18 U.S.C. § 152(2).  The issue of where a contingent fee agreement belongs on the bankruptcy forms was elevated to a matter of particular importance to the parties when the Court denied defendant's motion to dismiss Counts 5 and 8 on July 18, 2006, and his motion to reconsider on September 11, 2006.  The Court stated in connection with the order denying his motion to reconsider:  "The

---

[4]     The government has made it plain that Ms. Ogier will be called to testify in this regard at trial only if Mr. Wolff is permitted to testify.

government raises an issue of fact as to whether the defendant's specific arrangement with his client was an executory contract or a contingent claim." Minute Order of September 11, 2006; see also Memorandum Opinion and Order of July 18, 2006 ("Because Naegele's statements are not "indisputably true" but rather are open to multiple interpretations, it is for the jury to decide whether they were 'knowingly and fraudulently' false under 18 U.S.C. § 152.").

Mr. Wolff and Ms. Ogier have diametrically opposed views as to where on the bankruptcy Schedules a lawyer-debtor's contingent fee agreement with a client belongs. Schedule B is a schedule of personal property. Question 20 on Schedule B asks for a listing of "other contingent and unliquidated claims of every nature." Ms. Ogier believes that a contingent fee agreement between a debtor-lawyer and his client belongs on Schedule B in response to Question 20 because it is a contingent claim and therefore an item of personal property in which Naegele had a legal interest. Mr. Wolff, on the other hand, has opined that Mr. Naegele was not required to list his contingency fee agreement with his clients, Raymond and Deanna Albers, on Schedule B of his bankruptcy forms. Mr. Wolff would testify that the proper place for a lawyer-debtor to list a contingency fee agreement with a client, if it must be listed at all, is as an executory contract on Schedule G because a contingent fee agreement, such as the one between Mr. Naegele and the Albers, is an executory contract. Schedule G is entitled "Executory Contracts and Expired Leases" and, Mr. Wolff points out, the instructions at the top of Schedule B expressly direct the debtor to list executory contracts on Schedule G.

Both Ms. Ogier and Mr. Wolff testified that their opinions with respect to this matter are based on their years of experience representing debtors and serving as Panel Trustee. That experience necessarily involves their knowledge and understanding of bankruptcy law and,

10

so far as relevant, state statutory and common law.  Cf. Burkhart v. Washington Metropolitan Area Transit Authority, 112 F.3d 1207, 1212 (D.C. Cir. 1997) ("Of course, the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright.").  Each of them also has reviewed the fee agreement between Mr. Naegele and the Albers (Gov't Exhibit 2) and the addendum thereto (Gov't Exhibit 2), and each is prepared to testify how their general opinion with respect to Schedules B and G, executory contracts, and contingent fee agreements, should have applied in this case in view of the specific terms of the fee agreement and addendum.

While the Court intends to carefully circumscribe the testimony of Ms. Ogier and Mr. Wolff to avoid either of them impinging upon the province of the jury, the Court believes that each of them is qualified to testify as an expert on these matters and that their testimony would be helpful to the jury.  In view of the fact that the Court has concluded that the jury rather than the Court must decide as a matter of fact whether the defendant knowingly and fraudulently made false statements by failing to characterize his contingency fee arrangement with the Albers as a "contingent claim" on his Bankruptcy Schedules, the jury might well be confused without the aid of such experts.

In addition to these matters, Mr. Wolff also has been offered to provide his expert opinion on how debtors typically respond to the request for average monthly income posed on Schedule I, and how they respond to the question calling for a description of any anticipated increase or decrease of more than 10% in any of the categories listed in Schedule I, which are issues related to Counts 4 and 6 of the Indictment.  He will explain, if permitted to do so, that because Schedule I is confusing it is common practice for debtors to list net business income on

11

Schedule I and net business income in response to Question 1 on the Statement of Financial

Affairs ("SOFA").  He will opine that this practice is likely to continue unless and until Schedule

I is revised, or at least until the term "income" is defined in the bankruptcy forms.   In addition, if

permitted to do so, Mr. Wolff will testify that debtors often amend their Schedules because of the

confusion in the forms and the mistakes debtors initially make in preparing them.  In view of

these facts and defendant's statements at the Creditors Meeting, Mr. Wolff will further opine, if

permitted to do so, that the Panel Trustee should have instructed Mr. Naegele to amend his

Schedules.  Mr. Wolff also would opine that "debtors rarely respond to the question on Schedule

I asking a debtor to state an anticipated 10% increase or decrease in future income.  This is

because it is rarely the situation that a debtor has information about future income that is specific

enough to make such a determination."  Expert Witness Summary for Michael Wolff, Wolff

Exhibit 1 at 2-3.  All of these opinions are based in large part on Mr. Wolff's own experience as

a Panel Trustee.

          Even though this proffered testimony is based on his years of experience as a

bankruptcy lawyer and Panel Trustee, the Court finds that Mr. Wolff's testimony concerning net

versus gross income on Schedule I and in response to Question 1 of the Statement of Financial

Affairs would be speculative, as would his testimony about the 10% increase or decrease

question.  Furthermore, in view of the instructions contained on the bankruptcy forms – forms

which the jurors are capable of reading for themselves – the Court concludes that such testimony

would not only confuse the jury but also invade its province.  Reading forms and instructions on

how to complete them is a common experience in life, and no expert is needed to assist the jury

in this matter.  See United States v. Naegele, 341 B.R. 349, 359 (D.D.C. 2006) ("Defendant is

not foreclosed from arguing that he understood the form to call for a statement of his net income, but this is an issue for the jury, not for the Court."). While admittedly not all terms are defined in the bankruptcy forms, and the instructions are not all crystal clear, the forms speak for themselves. The jurors can and should read the forms, including the relevant instructions, and decide for themselves whether, in light of those forms and all of the other evidence presented at trial, the forms are ambiguous or whether Mr. Naegele (or anyone standing in a similar position) would be confused by them. If the jurors find the instructions or the questions on the forms to be ambiguous or confusing or that someone in Mr. Naegele's position would have been confused, they may infer that Mr. Naegele himself was confused and therefore did not have the intent to deceive or defraud his creditors. The result will be that the government will not be able to persuade the jury unanimously and beyond a reasonable doubt of Mr. Naegele's guilt on Counts 4 and 6.

Nor may Mr. Wolff testify with respect to what other debtors commonly do when they respond to questions on Schedule I or Question 1 of the SOFA. To the extent that this is another way to show that the forms are confusing, the Court already has explained that the jury is to read the forms for itself to determine whether or not they are confusing. To the extent that the behavior or the common practices of other debtors is offered for any other purpose, the Court must conclude that such evidence is neither reliable nor relevant to the primary issue in this case – whether or not Mr. Naegele, not anyone else in other situations – intended to commit the crimes with which he is charged. As the government correctly notes, such "expert" testimony would be no more relevant to the issues for the jury in this case than it would be to call other debtors selected by the prosecution or the defense to testify about their conduct and motivation.

13

Presumably in response to the Court's comments in open court on January 22, 2007 regarding its preliminary views and conclusions regarding this aspect of Mr. Wolff's proposed testimony, the defense filed a notice of authority later that day, directing the Court's attention to United States v. Sobin, 56 F.3d 1423 (D.C. Cir. 1995).  In that case, the D.C. Circuit held that it was "not an abuse of discretion warranting reversal" for the trial court to admit the expert testimony of Assistant U.S. Trustee Dennis Early, which "helped the jurors understand what information a bankruptcy trustee expects in response to the questions contained in the Financial Statement and why that information is important, not matters within most jurors' experience."  Id. at 1427-28.

On January 25, 2007, the government filed a response – including a sworn declaration from Mr. Early – arguing that the testimony admitted in Sobin "is distinguishable from Mr. Wolff's proffered opinions in that Mr. Early opined upon the importance and necessity of the forms for the administration of the bankruptcy estate; not the mindset or the actions of other debtors."  United States' Response to Defendant's Notice of Authority Regarding Proposed Expert Testimony of Michael Wolff ("Govt. Resp.") at 2.  Mr. Early declares that "[a]t no time did I testify as to the common practice of debtors in filling out the bankruptcy schedules and the statement of financial affairs."  Declaration of Dennis J. Early, Exhibit to Govt. Resp., ¶ 5.

Although the Court appreciates the efforts of the government to determine the specific nature of the expert testimony in Sobin, even without such distinguishing facts the Court is not persuaded of the relevance or reliability of Mr. Wolff's proffered testimony with respect to the common practices of other debtors, or the reasons or remedies therefor.  Nevertheless, under Sobin, it is within the Court's discretion to permit expert testimony it thinks might be helpful  to

14

the jurors in understanding "what information a bankruptcy trustee expects in response to the questions contained in the Financial Statement."  United States v. Sobin, 56 F3d at 1427-28.  The Court therefore is open to revisiting this issue at trial if the defense can explain specifically how this aspect of Mr. Wolff's testimony has become relevant – and is more reliable than it appears at this point – in light of the government's case-in-chief.[5]

### C.  Bruce Dubinsky

Bruce G. Dubinsky is a certified public accountant with a Bachelor's Degree in Accounting from the University of Maryland and a Master's Degree in Taxation from Georgetown University.  Mr. Dubinsky was a founder and, until recently, a principal in the firm of Klausner, Dubinsky & Associates where he held the position of Director of the Accounting and Dispute Analysis Department.  He recently founded the firm Dubinsky & Company, P.C. Mr. Dubinsky testified that he has had formal training in the bankruptcy process and the preparation of bankruptcy forms and Schedules, that he has prepared bankruptcy filings for debtors, and that he has worked on 60 to 70 bankruptcy cases in which, as a CPA, he has prepared income tax returns and filings for debtors.  As a forensic accountant, he has been qualified to testify as an expert in many cases, including one before this Court, with respect to the valuation of businesses, accounting and tax matters.  In this case, Mr. Dubinsky has reviewed Mr. Naegele's bankruptcy forms and Schedules, the fee agreements and bills between Mr. Naegele

---

[5]        The defendant filed a reply in support of this aspect of Mr. Wolff's proffered testimony on January 26, 2007, but the Court finds that the cases cited therein are distinguishable from this case and therefore are not persuasive.  See, e.g., United States v. Garcia, 447 F.3d 1327, 1335 (11th Cir. 2006) (expert testimony regarding drug trafficking organizations); Hangarter v. Provident Life and Accident Ins. Co., 373 F.3d 998, 1016-17 (9th Cir. 2004) (expert testimony regarding insurance industry norms).

and the Albers, and Mr. Naegele's tax returns (particularly Schedule C) for the years 1994

through 1999.  He is proffered as an expert in financial accounting, financial projections, federal

income taxation matters, federal bankruptcy accounting and reporting matters, and the general

accounting and billing processes for professional services firms, including sole proprietorship

law firms.  The Court finds that he is qualified to testify as an expert in all of these areas, with

respect to the matters about which the Court will allow him to testify.[6]

    First, Mr. Dubinsky is proffered as an expert to testify that Mr. Naegele's estimate

of $3,500 for total monthly income as reported on Bankruptcy Schedule I was reasonable, and on

the related issues respecting a sole proprietorship's reporting net income as opposed to gross

income on Schedule I.  For his conclusions in these areas, Mr. Dubinsky testified that he relied

almost exclusively on Mr. Naegele's tax returns, particularly Schedule C, then looked at

Schedules I and J of the bankruptcy filings, and did a series of calculations.  See, e.g.,Transcript

of January 10, 2007 Daubert Hearing at 22:25 - 25:5; see also id. at 28:25 - 29:18.  Many of the

calculations that Mr. Dubinsky described in his testimony related to an analysis of Mr. Naegele's

income and expenses and how they were reported on his bankruptcy forms as well as on his tax

returns.  See, e.g., id. at 88:7 - 89:8.  The government's written objections filed with the Court

relate to a lack of specificity in the written Daubert proffer.  See United States' Objections to

Defense Expert Testimony at 16.  Any vagueness therein, however, was cured by Mr. Dubinsky's

testimony and the production of several pages of his spreadsheets under Rule 612 of the Federal

Rules of Evidence.

---

[6]  The government does not dispute that he is an expert in the first three.

During oral argument regarding Mr. Dubinsky's opinion on net versus gross income, the government objected to Mr. Dubinsky's methodology because he looked only at historical trends and not also at Mr. Naegele's calendar year 2000 financial information, which could have been made available by defense counsel – that is, he did not incorporate the actual numbers from the first three months of 2000 in his analysis.  The Court concludes that this is not a reason to exclude Mr. Dubinsky's testimony for lack of reliability, although he certainly can be cross-examined with respect to the actual numbers at trial, as well as the methodologies he employed and the information he did and did not consider.   The matters as to which Mr. Dubinsky is proffered are well within his areas of expertise as listed above, and they are relevant to Count 4 of the Indictment, which charges Mr. Naegele with a false statement for stating on Schedule I that "his total monthly income was $3,500 when, in truth and in fact as he then well knew, his total average monthly income for the year 2000 was at least $16,850 and for the year 1999 was at least $10,000."  Testimony from Mr. Dubinsky would not invade the province of the jury but, rather, would assist it in trying to evaluate and consider otherwise esoteric concepts.

Second, if permitted to do so, Mr. Dubinsky also will testify concerning the defendant's response to the question on Schedule I, asking Mr. Naegele to forecast and report any anticipated increase or decrease in income exceeding 10% for the following year.[7]  He will explain the difficulties involved for a solo legal practitioner such as the defendant in forecasting future revenue and cash collections.  Based on a review of historical tax, accounting, and legal

---

[7]      Based on his familiarity with Schedule I and related commentary, Mr. Dubinsky also was proffered to testify on the clarity or lack of clarity of Schedule I and its instructions. Again, no expert in this case will be permitted to testify regarding the bankruptcy forms and their clarity or lack thereof.  The jury can read the forms and decide for itself whether they are clear or confusing.  See supra at 12-13.

documentation from defendant's law practice, Mr. Dubinsky will present analysis supporting the reasonableness of defendant's response to the question asking for any anticipated 10% increase or decrease in income.  This is an analysis which is certainly within one of Mr. Dubinsky's areas of expertise, as it involves straightforward financial projections – unrelated to any bankruptcy filings or issues.  While Mr. Dubinsky may not testify as to Mr. Naegele's state of mind or intent, about which he has no information, Mr. Dubinsky may testify regarding Mr. Naegele's financial condition and Mr. Dubinsky's opinion about the objective reasonableness of Mr. Naegele's response to the question asking for a forecast of a 10% increase or decrease in income.  See United States v. Barile, 286 F.3d 749, 759-61 (4th Cir. 2002).

Third, Mr. Dubinsky has reviewed information provided by the defendant on his Bankruptcy Schedules and forms and statements made by him at the Creditors Meeting on May 23, 2000.  Based on his review of the forms and Schedules, Mr. Dubinsky would testify that it is apparent that Mr. Naegele made disclosures during the course of the bankruptcy that indicate that he had made payments to creditors in the 90 days preceding the filing of the petition for bankruptcy.[8]  In Mr. Dubinsky's opinion, the Panel Trustee, Wendall Webster, therefore should have inquired further about such payments and any inconsistences between the places where such payments were disclosed and those where they were not – particularly Questions 3a and 3b of the Statement of Financial Affairs, which the defendant checked "None."  As to the first matter – what payments to creditors the forms and Schedules show at various places – it would be helpful to the jury for a bankruptcy expert like Mr. Wolff or Ms. Ogier to point out on the forms, and Mr.

---

[8]     Depending on the outcome of defendant's pending motion to dismiss Count 7 of the Indictment, this portion of Mr. Dubinsky's testimony may become irrelevant, in which case it will not be allowed.

Naegele's form in particular, where such information is called for and has been recorded.[9]  Mr.

Dubinsky, however, is no more qualified to read the forms than the jury is.  As to the second

matter, the Court will not allow Mr. Dubinsky to second guess the bankruptcy trustee, Mr.

Webster, for the reasons previously explained.  See supra at 8-9.  Mr. Dubinsky is even less

qualified to offer an opinion on this matter than Mr. Wolff, who at least himself has served as a

Panel Trustee.  Mr. Dubinsky's proffered testimony in this area therefore is excluded.

Fourth, based upon his experience in asset valuation, Mr. Dubinsky is offered to

testify that a lawyer's contingency fee agreement with a client is not a recordable asset under

General Accepted Accounting Principles ("GAAP") because, under GAAP, an asset has to have

value to be recordable.  He would testify that standard businesses are required to adhere to

GAAP and that GAAP is often used in bankruptcy filings.  He would testify further that these

principles are relevant and instructive for bankruptcy purposes as well, even if not determinative.

In his opinion, if contingency fee agreements are not recordable under GAAP, they need not be

reported or disclosed in bankruptcy.  Mr. Dubinsky certainly is qualified to testify about asset

valuation and GAAP.  His testimony on these matters would be reliable.  The question under

Daubert is whether such testimony is relevant to any issues in this case.  The Court concludes

that theories of recordable assets under GAAP are not directly relevant to the issues in this case,

as even Mr. Dubinsky obliquely acknowledges.  See Transcript of January 10, 2007 Daubert

---

[9]       Both Ms. Ogier and Mr. Wolff in describing bankruptcy procedure and
bankruptcy forms generally may point out various boxes, questions and inquiries on the forms
including the ones alluded to here.

Hearing at 115:4.[10]  The Court is not persuaded that such testimony would be helpful to the jury and, indeed, it might be needlessly confusing.  It will be excluded.

Finally, if permitted to do so, Mr. Dubinsky would testify that there are no accounts receivable for a law firm until an invoice is issued and that, in Mr. Naegele's case, there were no outstanding accounts receivable at the time he filed his bankruptcy petition.  These opinions are based upon Mr. Dubinsky's review of Mr. Naegele's legal bills to Raymond and Deanna Albers and to Roslyn Stewart, as well as on his knowledge of the professional legal billing process related to billing adjustments, write-offs, and related aspects of the billing and accounts receivable process for professional services firms such as defendant's law practice.  The government objects to this portion of Mr. Dubinsky's proffered testimony on the grounds that accounts receivable are not at issue in this case, as Mr. Naegele was not charged "with making a false statement on Schedule B, Item 15 ("Accounts Receivable")[.]"  United States' Objections to Defense Expert Testimony at 19.  If accounts receivable are not an issue in the trial, then Mr. Dubinsky will not be permitted to testify about them.  If the government does raise any issues with respect to accounts receivable, or if it becomes apparent that they are relevant in view of other testimony presented by the parties – such as, for example, in the context of Ms. Ogier or Mr. Wolff's testimony about contingent fee agreements – then Mr. Dubinsky's proffered testimony will be allowed.

---

[10]     The government is not saying that GAAP are never relevant to bankruptcy proceedings – just that they are not relevant to Chapter 7 proceedings of individual debtors (as opposed to Chapter 11 proceedings with respect to organizations).  See, e.g., Transcript of January 10, 2007 Daubert Hearing at 131:3 - 132:24.

*D.  Mark W. Foster*

Mark W. Foster is an attorney who has been a partner in the firm of Zuckerman

Spaeder LLP for 24 years.  Before that he spent four years at the Public Defender Service for the

District of Columbia and eight years in private practice with other firms.  He has served as Chair

of the D.C. Court of Appeals' Board on Professional Responsibility and as Vice Chair of the

D.C. Bar's Legal Ethics Committee.  He is a recognized expert on lawyer ethics, lawyer

discipline, and the Rules of Professional Conduct.  As part of his practice, Mr. Foster consults

regularly with law firms and law firm administrators on legal malpractice, lawyer discipline, the

unauthorized practice of law, and other issues relating to professional responsibility and the law

of lawyering.  He has experience in law firm management and law firm partnership accounting

and has advised and counseled law firms with respect to law firm mergers and acquisitions.  He

has offered testimony or sworn statements on professional responsibility, lawyers' standards of

care, legal fees, and related issues in 24 state or federal cases.[11]  Mr. Foster also was proffered as

someone with "significant experience with the practice of bankruptcy law[.]" Expert Witness

Summary for Mark Foster, Foster Exhibit 1, Tab 1 at 2.  He testified at the <u>Daubert</u> hearing that

he has worked on between 12 to 20 Chapter 11 cases for debtors and that, between 1989 and

1992, perhaps eighty percent of his practice involved such matters.  <u>See</u> Transcript of January 18,

2007 <u>Daubert</u> Hearing at 79:6-79:9.

Mr. Foster is proffered by the defense to provide his expert opinion on eight

discrete matters.  First, he is offered to explain that a lawyer stands as a fiduciary to his client and

---

[11]        Mr. Foster testified that three of these matters related to or touched upon
bankruptcy or creditors' rights issues and vaguely recalled that perhaps another three also may
have.  <u>See</u> Transcript of January 18, 2007 <u>Daubert</u> Hearing at 72:17-74:21.

has a duty to provide competent and diligent representation.  Furthermore, a lawyer practicing

bankruptcy law has a duty to be familiar with a specific set of statutes, rules and forms, and with

the Bankruptcy Court system.  Mr. Foster certainly is qualified to so testify and, should the

defense raise an advice of counsel defense through fact witnesses such as Mr. Sherman or Mr.

Naegele, Mr. Foster will be permitted to so testify, as his testimony then would be reliable and

helpful to the jury.

> Second, Mr. Foster is proffered to opine that an attorney who is represented by

counsel in a particular matter is entitled to rely on that counsel to the same extent that a lay

person is entitled to rely on his or her lawyer.  Having reviewed e-mail communications between

Mr. Naegele and his lawyer, Jeffrey Sherman, Mr. Foster would testify that in the circumstances

of this case Mr. Naegele was entitled to rely on Mr. Sherman to guide him through and assist him

with the bankruptcy process.  Should the issues be presented by the prosecution in its case-in-

chief or by the defendant's assertion of an advice of counsel defense through fact witnesses, the

Court will permit Mr. Foster to testify to these matters.  The Court will not, however, permit Mr.

Foster to testify that in the circumstances of this case, Mr. Naegele's reliance on Mr. Sherman

was "reasonable" or that Mr. Naegele "reasonably relied" on Mr. Sherman's advice.  Such

testimony would be speculative and based on assumptions about the communications and

relationship between Mr. Naegele and Mr. Sherman that are not fully reflected in the materials

reviewed by Mr. Foster in forming his opinion.

> Third, Mr. Foster is proffered to testify that in his opinion bankruptcy counsel has

an obligation to inform a debtor (and, presumably, also to assist a debtor in) how to properly

complete bankruptcy forms, "including whether the income figures requested on the forms

should be stated on a net or a gross basis by a sole proprietor-debtor." Expert Witness Summary

for Mark Foster, Foster Exhibit1, Tab 1 at 3. As an expert on the law of lawyering, Mr. Foster

certainly is competent to testify that a lawyer holding him or herself out as a bankruptcy

specialist has an obligation to advise a debtor on how to properly fill out bankruptcy forms and

Schedules; and such advice presumably would include, among other things, how to report

income (as net or gross). Again, should the defense raise an advice of counsel defense through

Mr. Sherman or Mr. Naegele's testimony, Mr. Foster will be permitted to so testify. During the

course of such testimony, Mr. Foster also may point out in the various e-mails between Mr.

Naegele and Mr. Sherman, <u>see</u> Foster Exhibit 2, Tabs 23-27, where it appeared to Mr. Foster that

Mr. Naegele was seeking advice with respect to such matters. To permit Mr. Foster go further,

however, and to testify that Mr. Naegele and Mr. Sherman "agreed" to file the Schedules

showing net rather than gross income would be pure speculation on Mr. Foster's part. As Mr.

Foster conceded at the <u>Daubert</u> hearing, not all of the consultations, conversations and

communications between Mr. Naegele and Mr. Sherman are reflected in the e-mails Mr. Foster

reviewed. In sum, if there is testimony from fact witnesses raising an advice of counsel defense,

then Mr. Foster may testify that a competent bankruptcy lawyer would discuss with his client

how to complete the forms and, among many other matters, how to report his income. He may

not speculate or make assumptions, however, about what transpired between Mr. Sherman and

Mr. Naegele after the exchange of the e-mails and before the filing of the Schedules.

Fourth, Mr. Foster is offered to provide an opinion that bankruptcy counsel should

take corrective actions with respect to a debtor's response to Question 3 of the State of Financial

Affairs "if the debtor's responses to other questions posed in the context of the bankruptcy are

internally inconsistent with the debtor's response to Question 3 of the Statement of Financial

Affairs."  Expert Witness Summary for Mark Foster, Foster Exhibit 1, Tab 1 at 4.[12]  The defense

apparently intends to raise a defense of good faith based on reliance on the advice of counsel.

Should these issues be presented by the prosecution in its case-in-chief or by the defendant's

assertion of an advice of counsel defense through fact witnesses, the Court will permit Mr. Foster

to testify regarding what Mr. Sherman should or should not have advised Mr. Naegele.  Mr.

Foster may not testify, however, as to facts that are not within his knowledge – for example, as

stated above, that Mr. Naegele's reliance was reasonable or that Mr. Naegele and Mr. Sherman

"agreed" on a particular course of action.  See supra at 23.

Fifth, Mr. Foster is proffered to testify that it is difficult to predict what earnings a

law firm might generate in the future from particular matters, and that this difficulty is especially

acute in small firms or with sole practitioners.  Mr. Foster is qualified to offer such an opinion,

and his opinion and the bases therefor would be reliable.  He also is qualified to testify that it

would be particularly difficult to predict the future income of a solo practitioner like Mr. Naegele

who, at the time of his bankruptcy filing, had only two clients.  Such testimony will be permitted.

The Court, however, will not permit Mr. Foster to testify with the benefit of hindsight about the

merits of or the likelihood of success in either the Roslyn Stewart case or the Albers case –

unless, of course, the government opens the door to such testimony during its case-in-chief.

Sixth, and related to the issue just discussed, Mr. Foster will not be permitted to

testify concerning his views about prayers for relief or ad damnum clauses in complaints in civil

---

[12]     Depending on the outcome of defendant's pending motion to dismiss Count 7 of
the Indictment, this portion of Mr. Foster's testimony also might become irrelevant, as Question
3 of the SOFA is the subject of Count 7.

cases or about the overblown nature of many attorneys' fees requests – again, unless the

government makes that issue  relevant to the issues in this case, for example by introducing

various court filings to try to show Mr. Naegele's alleged perception of the value of his

agreement with the Albers, as the defense thinks the government intends to do.[13]  If the

government injects civil litigation practice into this trial, the defense will be entitled to have an

expert explain ethical and common litigation tactics to the jury, to the extent that the Court finds

that such explanation is relevant and helpful when that time comes.[14]

---

[13]      The Court ruled in open court on January 25, 2007 that complaints from civil lawsuits would not be allowed in evidence in this case.  The government still has on its exhibit list proposed trial exhibits that were not excluded by the Court at that time.  The nature of these exhibits, if admitted, may entitle the defense to call Mr. Foster as an expert witness to explain various aspects of civil litigation practice.

[14]      As with the other proposed experts in this case, an expert witness summary for Mr. Foster was filed with the Court on December 15, 2006.  See Expert Witness Summary for Mark Foster, Foster Exhibit 1, Tab 1.  In addition, defense counsel sent a letter to the government on January 17, 2007, "to clarify the anticipated testimony of defense expert Mark W. Foster, Esq., in three respects."  January 17, 2007 Letter from Jonathan Jeffress to Joseph A Capone.

The government objected to and orally moved on January 18, 2007, to strike this clarification and (alleged) expansion of Mr. Foster's proffered testimony on the grounds that it constitutes a Rule 16 discovery violation.  The government also filed a motion for leave to file supplemental objections to the proposed testimony of Mr. Foster, and filed such supplemental objections on January 21, 2007.

The government objects to "two new areas of proposed expert testimony."  United States' Supplemental Objections to Proposed Defense Expert Mark W. Foster at 1.  The first is Mr. Foster's opinion regarding the status of Albers v. Brooks and Stewart v. Kaiser as of March 29, 2000.  The second is that "Mr. Foster will generally testify about the nature of civil pleadings and an attorney's duties with respect to them."  Id. at 2.  As explained, supra at 24-25, the Court does not intend to allow such testimony, on either point, from Mr. Foster – unless the government opens the door to such testimony during its case-in-chief.  The government will not be permitted to introduce court filings from civil litigation in evidence and then object to an expert testifying to help the jury understand what they may or may not mean.  As noted above, the Court does not intend to allow Mr. Foster to testify about what Mr. Naegele did or did not actually believe about the value of the claims of his clients.  Mr. Naegele's intent is a matter for

Seventh, Mr. Foster is proffered as an expert on contingency fee agreements between lawyers and their clients and how they should be reported in bankruptcy filings. Although Mr. Foster has substantially less experience than either Ms. Ogier or Mr. Wolff in representing debtors in bankruptcy cases and no experience in Chapter 7 cases (all of his experience is in Chapter 11) or as a Panel Trustee, for the same reasons as discussed earlier with respect to Ms. Ogier and Mr. Wolff, the Court will permit Mr. Foster to testify that in his opinion it would be appropriate to list a contingency fee agreement between lawyer and client on Schedule G rather than on Schedule B and/or that it would be appropriate not to list it at all, and the bases for that opinion.[15]  One of the bases for this opinion in his view is that "in order for a lawyer to recover under a contingency fee agreement . . . the lawyer must substantially perform under the agreement."  Expert Witness Summary for Mark Foster, Foster Exhibit 1, Tab 1 at 3. On cross examination and in response to questions from the Court, he acknowledged that this was only one of a myriad of factors.  Nevertheless, Mr. Foster's testimony may be relevant and helpful to the jury in understanding Mr. Naegele's financial status.  During the Daubert hearings, the government elicited testimony regarding the provision in the Albers fee agreement providing that Mr. Naegele was entitled to a percentage of any recovery they achieved in their lawsuit regardless of whether Mr. Naegele continued to work on it.  Mr. Foster's testimony with respect to contingency fee arrangements, and the Albers' agreement in particular would be especially

_____

the jury to decide and is not appropriate for expert testimony.  See supra at 18.

[15]     Although he does have less experience in general bankruptcy matters than Ms. Ogier or Mr. Wolff, Mr. Foster has much more experience with the law governing lawyers, and experience with respect to the responsibilities and vagaries of the lawyer as debtor.

relevant if the government makes contingent fee agreements an issue in its case-in-chief (as it appears that it will).

Finally, Mr. Foster is offered to testify that lawyers in the private practice of law (not just bankruptcy lawyers) have ethical obligations to review the time spent on behalf of clients and to "write down" or "write off" time before sending bills to clients.  Furthermore, if permitted to do so, he will testify that "there is nothing inherently wrong with an attorney-debtor writing down time before filing for bankruptcy."  As an expert in the law of lawyering, Mr. Foster is qualified and competent to offer such opinions, and his opinions are reliable.  To the extent that this issue does become relevant during the course of the trial, Mr. Foster will be permitted to testify concerning it.  As noted, <u>supra</u> at 20, however, the government has represented that issues relating to accounts receivable are not at issue in this case.

SO ORDERED.


_____/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE: January 29, 2007